FILED

JUN 23 2022

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS**

SA22CA0659FB

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* JESUS NUNEZ-UNDA,<br><br>Plaintiff-Relator,<br><br>v.<br><br>LAFAYETTE RE MANAGEMENT LLC, BRANDYWINE HOMES USA LLC, and THIBAULT ADRIEN,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. §§ 3729, *et seq.***<br><br>**JURY TRIAL DEMANDED**<br><br>**FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

**INTRODUCTION**

1.    *Qui tam* Plaintiff-Relator Jesus Nunez-Unda ("Relator"), through his undersigned attorneys, hereby brings this action pursuant to the False Claims Act, 31 U.S.C. §§ 3729, et seq. ("FCA") on behalf of the United States of America against Lafayette RE Management LLC; Brandywine Homes USA LLC (together, the "Entity Defendants"); and Thibault Louis Philippe Adrien (the "Individual Defendant"), (collectively, "Defendants"). The claims asserted in this Complaint are based on the facts and information set forth below, and upon information and belief, unless otherwise stated.

2.    Relator sues Defendants to recover treble damages, civil penalties, and all other appropriate relief on behalf of the United States for deceiving the United States Small Business Administration ("SBA") to receive approximately $675,882 in Paycheck Protection Program ("PPP") loans guaranteed by the SBA, using those funds to enrich themselves.

- 1 -

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

3.     The PPP loans were made to the Entity Defendants based on their representations that the loans were necessary due to economic uncertainty and that they would be used in the manner prescribed by Congress and the SBA pursuant to the PPP program. But Defendants never needed the PPP money to retain jobs in the manner required by the SBA, and they made false representations in the applications both for the loans and for forgiveness.

4.     In particular, Adrien, who dominates the operations and decision making of the Entity Defendants, used the PPP funds for his own ends not authorized by the PPP program including, among other things, pursuing corporate expansion—funding the expenses associated with a complex and ultimately unsuccessful attempted corporate acquisition—acquiring new staff, and investing in new infrastructure, which would primarily benefit him as the majority shareholder of the Entity Defendants.

5.     Adrien saw the PPP program as an opportunity to get free money from the government that allowed him to invest in his businesses. This money was not necessary due to economic uncertainty. Instead, it would allow him to leverage the Entity Defendants in whatever aggressive ways he saw fit, all without having to put an additional dime of his own money into his own businesses to ensure his employees would keep getting paid.

6.     All the while, this free money allowed Adrien to continue to fund his own lavish lifestyle through LLC member distributions to his partners and himself that, but for the PPP money, would have been impossible to do while also paying employees, investing in new corporate infrastructure, and bankrolling the failed acquisition.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

7.     Defendants' business—single-family rental and property management— has experienced a boom since the pandemic began. Throughout 2020, much of the economy remained dislocated and millions of American businesses and middle-class families suffered economic hardship because of the pandemic. But the 2,700 middle-class households in the Entity Defendants' portfolio—168 of which are located in the San Antonio area of this District—had higher occupancy rates, more leases renewed, and tenants paying higher rents.

8.     Defendants knew about these trends in real time and knew the Entity Defendants did not need the government's help when they applied for PPP loans. Adrien (the CEO and principal owner of the Entity Defendants) had access to real-time data on occupancy of and rent collections for the Entity Defendants' properties, as well as data on market-wide trends, the sum of which showed that single-family residential real estate was performing and would perform well during the pandemic.

9.     Indeed, Adrien was so confident in the performance of single-family property rentals during the pandemic that even before applying for the PPP loans, he was already pitching his investors to pile even more money into the sector, through investing in public securities of competitors and building new communities and units. One of Lafayette's partners—a multinational private equity firm with over $300 billion in assets under management—even told Adrien on April 14, 2020 that "their conviction for the asset class has only increased in the last few days" and that Lafayette should "take advantage of the current situation, and go and find more [single-family residential] communities from homebuilders" because "[t]hey … have witnessed strong leasing activity in the last few weeks, and similar collection numbers" to pre-pandemic years.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

10.     Adrien also submitted payroll documentation that included fake employees who never actually worked at Lafayette; his housekeeper; and others who were foreign nationals employed by Lafayette based on student visas obtained through papered American online "graduate programs" who do not satisfy USCIS guidelines for working under those visas.

11.     The PPP program was intended to protect small businesses facing historic and existential disruptions of their businesses and dangers to the livelihoods of their employees, not to grant private equity fund managers free money to further build and consolidate their wealth. Defendants abused this historic and important program—all the while receiving record profits from the middle-class American families renting their homes—and in doing so have violated, *inter alia*, the False Claims Act.

## PARTIES

### I.     Relator – Jesus Nunez-Unda

12.     Relator graduated with a degree in economics from the Tecnológico de Monterrey in Mexico; earned an MSc at HEC Paris in 2005; and received an MBA from The University of Chicago in 2011.

13.     Relator also has years of financial industry experience working at global financial institutions, such as Lehman Brothers in London, HSBC Securities in New York, and Goldman Sachs & Co. in New York and Mexico City.

14.     Relator is a former employee of Defendant Lafayette, having worked there from October 2019 until May 2021 under the title of Partner. In that capacity, he worked on various components of investment management and investment strategy for Lafayette.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

15.    Relator worked closely with CEO Adrien.

16.    Relator was asked by Adrien to prepare the Entity Defendants' PPP applications using supporting payroll materials provided to him by Adrien and Isabelle Lèvilain, the Entity Defendants' Director of Human Resources.

17.    In or about November 2020, Relator was again asked by Adrien to prepare Lafayette's PPP loan forgiveness applications. Once again, Relator relied on supporting payroll materials provided to him by Adrien and Levilain.

18.    Relator did not understand at the time the nature of the fraud alleged herein, because he had no formal training or background in human resources nor access to the payroll systems, and never had access to Lafayette's financial statements.

19.    Relator ceased to be employed by Lafayette on June 20, 2021.

## II.    **Entity Defendants**

### A.    **Lafayette RE Management LLC**

20.    Lafayette RE Management LLC is an LLC formed in Delaware, with its principal place of business at 853 Broadway, 5th Floor, New York, New York.

21.    Adrien founded Lafayette in 2011 and serves as its Chief Executive Officer ("CEO") and Managing Member.

22.    Lafayette is a private asset manager that invests in residential real estate and owns and operates a series of LLCs for the same purpose.

23.    Lafayette is majority owned by Adrien, but has three other minority members.

24.    Lafayette's members and Adrien's associates and/or partners include, Julien Fabre, Louis Villa, and Michael Ogrinz.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

25.    Lafayette manages more than $900 million in gross assets through its own funds via on-shore and off-shore investment vehicles, as well as a joint investment vehicle, Lafayette Communities, managed on behalf of The Carlyle Group Inc.

26.    The chart below, which appears on page 8 of Lafayette's 2020 Annual report, outlines the footprint of Lafayette's 2,700+ homes across ten markets at the end of 2020:



27.    The single-family homes owned by Lafayette affiliated funds are targeted to middle-class families. On April 14, 2020, Adrien sent a communication to investors where he stated that the portfolio's properties had an "average rent [per home] of $1,338 per month…."

28.    Upon information and belief, the four active investment vehicles managed by Lafayette as a General Partner are Lafayette Longview ("Longview"), Lafayette Housing Recovery III, Lafayette Land, and Lafayette Communities (a joint-venture with The Carlyle Group).

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

29.     Lafayette members Villa and Ogrinz are board members of Longview along with Adrien, Joel Roberto, Édouard Guerrand-Hermes, and Jacques-Antoine Ormond.

30.     Lafayette generates recurring revenue through a "management fee" for all its funds as a fixed percentage based on the quarterly value of its assets under management, which are predominantly single-family homes.

31.     Lafayette's investor roster includes Xavier Niel via NJJ Group, the Frère-Bourgeois Holding Company via Compagnie Nationale à Portefeuille S.A (CNP), the Guerrand-Hermes Family via Jakyval S.A., Eurobail S.A., 1875 Finance, the Hamlin Family via LBCW Holdings, Premier Investissement, and other predominantly European ultra high-net-worth investors.

32.     The relationship between Adrien, the Entity Defendants, and their various investment vehicles, subsidiaries, and partners is reflected by the organizational chart below:



CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

33.    Upon information and belief, Lafayette's annual revenues have been stable around $3.5 million for the last few years.

34.    A presentation dated February 6, 2020, sent by Adrien to Longview's board recapping the fund's 2019 performance, stated that "SFR portfolio continue[s] to perform well, with 5% annual growth in revenues."

35.    The slide below, which appears on page 2 of that presentation, illustrates that Longview's "Investment Profit" for 2019 was $4.135 million:



36.    Lafayette also has an 11.5% ownership interest in its own investment fund, Longview, and thus receives semi-annual distributions equally like other investors.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

37.     Upon information and belief, all of Lafayette's net income is distributed to its members.

38.     On or about April 10, 2020, Lafayette applied for a PPP loan.

39.     Lafayette's PPP loan was approved on or about April 21, 2020, and Adrien on behalf of Lafayette executed the PPP loan note on or about April 24, 2020.

40.     During 2020, occupancy and collections on the portfolio of single-family homes managed by Lafayette, and owned directly or indirectly by Lafayette affiliated funds, were at least stable against pre-pandemic benchmarks and in some cases were at all-time highs. On or about April 10, 2020 and in the weeks that followed when subsequent loan notes and forgiveness applications were submitted, Lafayette did not face any unusual risk or economic uncertainty that placed its solvency or ability to pay its employees at risk.

**B.      Brandywine Homes USA LLC**

41.     Brandywine Homes USA LLC is an LLC formed in Delaware, with its principal place of business at 2107 N. Decatur Road, Suite 210, Decatur, Georgia.

42.     Brandywine is majority owned by Adrien.

43.     On information and belief, Brandywine's CEO Jackie Lee and Lafayette's Vice-President Liya Mo each own or are in the process of vesting minority interests in Brandywine.

44.     Brandywine manages the properties in which Lafayette invests, including but not limited to those in the Western District of Texas, through an office opened in San Antonio in or about April 2020.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

45. Brandywine manages properties in at least eight metropolitan areas, as shown in the chart below, which appears on page 22 of Lafayette's 2020 Annual Report:



46. Brandywine receives as revenues of 7% of the rent collected from the homes in the portfolio.

47. On or about April 10, 2020, Brandywine first applied for a PPP loan. That application was rejected.

48. After the rejection, on or about April 24, 2020, Brandywine applied again for a PPP loan.

49. On or about May 19, 2020, Brandywine's PPP application was approved. On information and belief, Adrien similarly executed the PPP loan note on Brandywine's behalf shortly thereafter.

50. During 2020, occupancy and collections on the portfolio of single-family homes managed by Brandywine were at least stable against pre-pandemic benchmarks

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

and in some cases were at all-time highs. On or about April 10, 2020, and in the weeks that followed when subsequent loan notes and forgiveness applications were submitted, Brandywine did not face any unusual risk or economic uncertainty that placed its solvency or ability to pay its employees at risk.

### III. Individual Defendant – Thibault Adrien

51. Thibault Adrien is the CEO and managing member of Lafayette.

52. Adrien founded Lafayette in 2011.

53. On information and belief, Adrien owns about 75% of Lafayette.

54. Adrien founded Brandywine in 2014.

55. Adrien is also the managing member of Brandywine, of which he owns about 90%.

56. Prior to founding Lafayette, Adrien was Vice President of the Private Equity Group of Fortress Investment Group, and before that a Mergers & Acquisitions Analyst at Lehman Brothers in London, United Kingdom.

57. Prior to that, Adrien was an attorney at Ashurst LLP in Paris, France.

58. Adrien received a post-graduate degree in Business & Tax Law from Paris II University.

59. Adrien is a French national and has been a New York City resident since at least Lafayette's founding in 2011, residing under an investor visa. On information and belief, he currently resides at 520 LaGuardia Place 3N, New York, New York.

60. Adrien dominates the decision-making and operations of the Entity Defendants and is the Founder and Managing Partner of both entities.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

61.    Adrien operates on a "need to know" basis, keeping employees and partners in the dark about what he is doing and why he is doing it.

62.    On information and belief, Adrien's domination of the Entity Defendants has caused frequent instances of abuse, harassment, and other wrongdoing, including but not limited to religious, racial, and gender discrimination against employees, harassment, willfully breaching agreements, and making misrepresentations to investors.

63.    On information and belief, few, if any, employees at the Entity Defendants have the necessary information or clout to fully understand Adrien's decisions or challenge them.

64.    Adrien is the signatory on the Entity Defendants' PPP loan and loan forgiveness applications.

## JURISDICTION AND VENUE

65.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1345 because this action involves a federal question and the United States is a plaintiff. This Court also has subject matter jurisdiction under 31 U.S.C. § 3732(a).

66.    The Court may exercise personal jurisdiction over Defendants under 31 U.S.C. § 3732(a) because they transact business within this District.

67.    Venue is proper in this District under 31 U.S.C. § 3732(a) because Defendants transact business within this District. Venue is also proper under 28 U.S.C. § 1391(b).

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

68.     In particular, Lafayette transacts business within this District by owning, directly or indirectly, investment properties in the district, as well as participating in the evaluation of potential properties and purchase of properties in the District.

69.     In particular, Brandywine transacts business within this District by managing properties owned directly or indirectly by Lafayette in the District.

70.     In particular, Adrien transacts business within this District by virtue of his role as a CEO and/or managing member of the Entity Defendants.

71.     This Complaint is not based on a public disclosure as defined in 31 U.S.C. § 3730(e). Relator sues as the original source of information regarding Defendants' violations of the FCA, given that Relator has direct and independent knowledge of the information on which the allegations are based and/or knowledge that is independent of and materially adds to any allegations or transactions that may have been publicly disclosed (although Relator knows of no such public disclosure).

72.     No allegation in this Complaint is based on a public disclosure of allegations or transactions in a federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or from the news media. Rather, Relator is the original source under 31 U.S.C. § 3730(e)(4).

## THE FEDERAL FALSE CLAIMS ACT

73.     The FCA makes it unlawful for any person to submit, directly or indirectly, false or fraudulent claims for payment to the Government. *See* 31 U.S.C. §§ 3729, *et seq.* Originally enacted in 1863, the FCA was substantially amended in 1986 by the False Claims Amendments Act. The 1986 amendments enhanced the Government's ability to

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

recover losses sustained because of fraud against the United States. Relator alleges liability primarily under three of the FCA's seven liability provisions.

74.     First, the FCA's "presentment" provision, 31 U.S.C. § 3729(a)(1)(A), imposes liability when a defendant (a) made, or caused to be made, a claim, (b) that was false or fraudulent, (c) while knowing of its falsity.

75.     Second, the FCA's "false records or statements" provision, 31 U.S.C. § 3729(a)(1)(B), imposes liability when a defendant (a) made, used, or caused to be made or used, a record or statement, (b) that was knowingly false, and (c) that was material to a false or fraudulent claim.

76.     Third, the FCA's "conspiracy" provision, 31 U.S.C. § 3729(a)(1)(C), imposes liability when a defendant conspires to commit a violation of the FCA.

77.     The "knowledge" element of the FCA is defined as (1) "actual knowledge of the [falsity of the] information"; (2) "deliberate ignorance of the truth or falsity of the information"; or (3) "reckless disregard of the truth or falsity of the information" provided to the Government. 31 U.S.C. § 3729(b)(1)(A). No specific intent to defraud need be shown. 31 U.S.C. § 3729(b)(1)(B).

78.     Under the FCA, the term "claim" means any request or demand for money, whether under a contract or otherwise, presented to an officer, employee, or agent of the United States. 31 U.S.C. § 3729(b)(2)(A)(i). A "claim" is also a request or demand for money made to a contractor or other recipient if (a) the money is to be spent or used on the Government's behalf or to advance a Government program or interest and (b) if the Government provides, has provided, or will reimburse such contractor or other recipient for any portion of the money requested or demanded. 31 U.S.C. § 3729(b)(2)(A)(ii).

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

79.    The FCA defines "material" objectively to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The Supreme Court reaffirmed the natural tendency materiality test—even as to subsection (a)(1)(A), which does not explicitly use the term—and described a holistic approach to analyzing it. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 181 (2016).

80.    The FCA empowers private persons who have information regarding a false or fraudulent claim against the Government to sue on the Government's behalf and to share in any recovery. 31 U.S.C. § 3730(b).

## **FACTUAL ALLEGATIONS**

## IV.    **The CARES Act and the PPP Program**

81.    To curb the spread of COVID-19, federal, state, and local governments implemented public health measures with substantial consequences for businesses.

82.    Many small businesses were temporarily closed.

83.    To help companies affected by the spread of COVID-19, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") created emergency relief for businesses affected by the COVID-19 crisis. *See* Pub. Law 116–136.

84.    Among other programs, the CARES Act created a low-interest (1.00%) Paycheck Protection Program ("PPP")[1] loan as a part of the Small Business Administration's existing section 7(a) loan program, which allowed many small businesses to apply for loans through private financial institutions.

---

[1]    *See generally* https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program (last accessed June 21, 2022).

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

85.    Like other section 7(a) loans, PPP loans are initially funded by authorized private lenders, with repayment guaranteed by the SBA to make the loans easily saleable on the secondary market.

86.    To encourage lenders to make these loans, and to do so quickly, the SBA gave lenders delegated authority to underwrite and issue the loans based solely on the borrower's certifications and imposed on the lenders only minimal document review requirements. 85 Fed. Reg. 20811-01, Part III.3.a.iv. and b.

87.    To qualify for forgiveness, PPP loan proceeds must be used for authorized business purposes within the "loan forgiveness covered period," which is the 24-week period beginning on the disbursement date (except that, for loans made before June 5, 2020, the borrower may elect to use the original 8-week period that was defined in the law in force at that time). 85 Fed. Reg. 36308-01, 36310 Part III.c. (revising 85 Fed. Reg. 20811, 20813 Part III.2.n.).

88.    Within 10 months after the loan forgiveness covered period, the borrower may seek partial or full loan forgiveness by submitting to the lender an application for forgiveness and documentation showing that the funds were used for approved purposes during the requisite period of time.

89.    Upon approval of the forgiveness application by the lender and the SBA, the SBA then pays the loan in full.

90.    The CARES Act allowed PPP loan proceeds to be used for payroll, continuation of group health care benefits and insurance premiums, salaries and other compensation, rent, utilities, and interest on prior debt. 15 U.S.C. § 636(a)(36)(F)(i).

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

91.    Congress left further details to the SBA, directing that the agency should issue guidance and regulations implementing the PPP program within 30 days. Pub. Law 116–136 § 1106(k).

92.    On April 2, 2020, the SBA promulgated and published on its website the First Interim Final Rule implementing the PPP program, which was published in the Federal Register two weeks later. *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811-01 (Apr. 15, 2020) (effective Apr. 15, 2020); 85 Fed. Reg. 36308 (noting earlier publication on SBA website).

93.    Two months later, upon passage of the June 5, 2020 Paycheck Protection Program Flexibility Act of 2020 ("Flexibility Act"), the SBA promulgated its Revisions to First Interim Final Rule. *See* Business Loan Program Temporary Changes; Paycheck Protection Program—Revisions to First Interim Final Rule. 85 Fed. Reg. 36308-01 (June 16, 2020) (various effective dates).

94.    In broad terms, the Flexibility Act and Revisions to First Interim Final Rule:

    i.    expanded the time during which the loan proceeds could be spent (from eight weeks to 24 weeks after disbursement, which are now defined as the "loan forgiveness covered period");

    ii.    expanded the payment deferment period (from six months after disbursement to final determination by the SBA of an application for forgiveness timely submitted within 10 months after the "loan forgiveness covered period"); and

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

    iii.    extended the maturity date from two years to five years for loans made on or after June 5, 2020 (and also allowed a five-year maturity on earlier loans upon agreement of the lender and borrower).

95.    In these rules, the SBA explained that "[t]he actual amount of loan forgiveness will depend, in part, on the total amount of [eligible costs incurred] over the loan forgiveness covered period." 85 Fed. Reg. 20811, 20813 Part III.2.o. as revised by 85 Fed. Reg. 36308-01, 36311 Part III.d (effective Mar. 27, 2020).

96.    In the First Interim Final Rule, the SBA initially explained that although the list of authorized uses for PPP loan proceeds in the CARES Act applied, "at least 75 percent of the PPP loan proceeds shall be used for payroll costs." 85 Fed. Reg. 20811-01, 20814 Part III.2.r. The Revisions to First Interim Final Rule, however, retrospectively changed this requirement to 60% and allows partial forgiveness of the loan so long as at least 60% of the forgiven amount was used for payroll costs incurred during the requisite time period. 85 Fed. Reg. 36308-01, 26310-11 Part III.d. (revising 85 Fed. Reg. 20811, 20813-14 Part III.2.o.) (eff. Mar. 27, 2020).

97.    The SBA also explained that "payroll costs" do not include "compensation of an individual employee in excess of an annual salary of $100,000." 85 Fed. Reg. 20811-01, 20813 Part III.2.g.ii.

98.    If PPP loan proceeds are used for "unauthorized purposes," the SBA "will direct" that the money be returned, and if it is knowingly used for unauthorized purposes, the SBA warns that additional liability, including "charges for fraud," may apply. 85 Fed. Reg. 20811-01, 20814 Part III.2.s.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

99.    To apply for a PPP loan in April 2020, as Defendants did, the SBA required an applicant's representative to certify in good faith that:

i.    The applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, ....

ii.    Current economic uncertainty makes this loan request necessary to support the ongoing operations of the applicant.

iii.    The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments; I understand that if the funds are knowingly used for unauthorized purposes, the Federal Government may hold me legally liable such as for charges of fraud. As explained above, not more than 25 percent of the loan proceeds may be used for non-payroll costs.

iv.    Documentation verifying the number of full-time equivalent employees on payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities *for the eight week period following this loan* will be provided to the lender....

v.    I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law ....

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

      vi.    I acknowledge that the lender will confirm the eligible loan amount using tax documents I have submitted. I affirm that these tax documents are identical to those submitted to the Internal Revenue Service. I also understand, acknowledge, and agree that the Lender can share the tax information with SBA's authorized representatives .... 85 Fed. Reg. 20811-01, 20814 Part III.2.t. (emphasis added).[2]

100.    Lenders began accepting applications for PPP loans on April 3, 2020.[3]

## V.    <u>LAFAYETTE AND BRANDYWINE SECURE PPP LOANS</u>

101.    As explained above, on or about April 10, 2020, Lafayette applied for a PPP loan.

102.    After its first application was rejected, on or about April 24, 2020, Brandywine applied for a PPP loan.

103.    On both applications, Adrien was the signatory for the Entity Defendants. Adrien, on behalf of both Lafayette and Brandywine, made all the necessary certifications for the application, including as relevant here:

---

[2]    On June 16, 2020, after the certifications at issue here, the SBA revised its interim final rule to allow (1) up to 40 percent of loan proceeds to be used for *permissible* non-payroll purposes and (2) revised documentation requirements. 85 Fed. Reg. 36308-01, 36311 Part III.f.

[3]    *See* O'Connell et al., *Following messy start, enormous Paycheck Protection Program shows signs of buttressing economy*, Wash. Post. (Jun. 10, 2020), at https://www.washingtonpost.com/business/2020/06/09/how-effective-is-ppp-small-business/ (last accessed June 22, 2022).

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

    i.     "All SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program;"

    ii.    "Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant;"

    iii.   "The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges for fraud;" and

    iv.   "I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects."

104.   On or about April 24, 2020, Lafayette's PPP application for $335,000 was approved. On or about May 19, 2020, Brandywine's PPP application for $340,882 was approved.

105.   The Lafayette PPP loan funds were deposited into Lafayette's operating bank account at Wells Fargo (account ending # 8046) and co-mingled with the rest of the company's cash balances and deposits.

106.   The Brandywine PPP loan funds were deposited into Brandywine's operating bank account at Wells Fargo (account ending in #6206) and co-mingled with the rest of the company's cash balances and deposits.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

107.    Adrien was the signatory for the Entity Defendants in their execution of the loan notes for the PPP loans. In signing the notes—Lafayette on or about April 24, 2020 and Brandywine on or about May 19, 2020—Adrien acknowledged, as relevant here, that:

  i.    "Borrower is in default under this Note if Borrower ... [d]oes not disclose, or anyone acting on their behalf does not disclose, any material fact to Lender or SBA;"

  ii.    "By signing below, Borrower certifies, represents, warrants, and agrees":

   a.    "All certifications, authorizations, and representations made by Borrower and/or the authorized representative of Borrower in the Paycheck Protection Program Borrower Application Form (SBA Form 2483) submitted to Lender remain true and accurate as of the date of this Note;" and

   b.    "No parts of the proceeds of such Loan will be used for personal, family or household purposes."

## VI.    DEFENDANTS' VIOLATIONS OF THE FALSE CLAIMS ACT

108.    The PPP loans were fraudulently induced. Defendants never needed the PPP money to create or retain jobs in the manner required by the SBA, and made false representations in the application to represent otherwise.

109.    As described above, between or about April 10 and April 24, 2020, to obtain the PPP loans, Adrien, on behalf of the Entity Defendants, certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

110.    Later, between or about April 24 and May 19, 2020, Adrien executed loan notes certifying that "All certifications, authorizations, and representations made by Borrower and/or the authorized representative of Borrower in the Paycheck Protection Program Borrower Application Form (SBA Form 2483) submitted to Lender remain true and accurate as of the date of this Note."

111.    When Adrien made these certifications in April and/or May 2020 on behalf of the Entity Defendants, they were not true and Defendants knew they were false when made based on real time data, historical performance, and market-wide trends.

112.    Adrien viewed the PPP loans to the Entity Defendants as an opportunity to get free money from the government that allowed him to invest in his businesses without having to invest any more of his own money in these entities.

113.    Adrien, who dominates the operations and decision making of the Entity Defendants, used the PPP funds for his own ends to invest in the growth of his businesses—through attempted acquisitions, staffing, and corporate infrastructure not authorized by the PPP program—which would primarily benefit him as the majority shareholder of the Entity Defendants—and fund the expenses associated with a complex and ultimately unsuccessful attempted corporate acquisition that would have resulted in millions of dollars of profits to Adrien personally and his associates.

114.    Lafayette was able to hire new high-dollar employees while maintaining its distributions to Adrien and other members and funding an attempted acquisition, all without any additional contribution from Adrien or other investors. Clearly, there was no current economic uncertainty; to the contrary, the economics were quite certain and positive.

- 23 -

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

**A.    Defendants falsely certify that the loans are necessary.**

115.    While COVID-19 was significantly disruptive for a great number of industries, single-family real estate—Defendants' bread and butter—experienced a boom.

116.    As explained above, when applying for the PPP loans, Defendants—with Adrien as signatory—had to certify that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."

117.    The Entity Defendants' revenues were not at risk and they did not face any economic uncertainty on or about April 10, 2020. They also did not face any economic uncertainty later in April and/or May 2020 when Adrien executed the PPP loan notes, which required him to re-certify that his prior certifications concerning economic necessity were still accurate, when they in fact were not accurate.

118.    In other words, Defendants' PPP loan certifications concerning necessity due to economic uncertainty were knowingly false.

**1.    Proposed Equity Investments with "Excess Capital" in March and April 2020**

119.    By late March 2020, Defendants were sufficiently confident in the business' outlook that Adrien, Relator, and other Lafayette employees were preparing presentations to external investors pitching ways to take advantage of the housing sector's strength by investing in underpriced stocks and/or other securities of publicly listed competitors.

120.    Between March 30 and 31, 2020, Relator, Adrien, Thibaud Favier (an associate at Lafayette), and Armand Silly (an analyst at Lafayette) exchanged emails concerning economic projections to include in a presentation to the Longview board of

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

directors to propose a new strategic investment in the stock of Invitation Homes, Inc. ("INVH").

121.    On April 7, 2020, that presentation concerning the proposal that Longview invest in INVH was sent to the Longview board.

122.    On April 8, 2020, Adrien followed up privately with Benoit Robertz, a Longview investor and partner at Compagnie Nationale à Portefeuille ("CNP"), a Belgian private investment firm with assets worth about €2 billion euros:

| | |
|---|---|
| **Subject:** | Fwd: INVH |
| **Date:** | Wednesday, April 8, 2020 at 12:42:01 PM Eastern Daylight Time |
| **From:** | Thibault Adrien |
| **To:** | Jesus Nunez Unda, Thibaud Favier, Armand Silly |
| **Attachments:** | INVH_April2020_Pitch_Long_Draft v8.pptx, INVH_Simplified Valo model_Laf_4.6.20.xlsx |

--------- Forwarded message ---------
From: Thibault Adrien <thibault@lafayette-re.com>
Date: Wed, Apr 8, 2020 at 10:50 AM
Subject: Fwd: INVH
To: Benoit Robertz <brobertz@cnp.be>

123.    In that email, in a mixture of French and English,[4] Adrien included the investment highlights of the INVH opportunity with the aim of convincing Robertz to co-invest with Lafayette. Adrien told Robertz that the presentation was a follow-up of a previous conversation, "mostly technical" and that, although it did not talk "too much about the fundamentals, basically what we see is that:"

---

[4] Based on Relator's advanced level of French comprehension, communications by the Defendants or third parties in French (or a mixture of French and English) are translated in uncertified form here.

**Short term:**
- Collections for April are in line at 75% collection rate on the 6th of the month
- May should be supported by unemployment benefits until end of July
--> we should avoid the short term catastrophe

**Mid term:**
- Rent levels: unless the virus gets out of control we think landlords will stick to their headline rents and offer concessions as a bridge. They will experience more delinquencies and 2020 will be bad, but 2021's starting point will be the same as 2020's.
- Anecdotes of tenants cancelling their move out. We should have good retention rates in the next few months (excluding forced move out situations)
- Leasing activity remains strong despite the lockdown, for us and our peers.
- Anecdotes of tenants moving out of crowded MF building towards SFH - people want more space
- Homeownership is going to go back down and for a while.
--> need for space + more renters overall: bullish for SFR


A ta dispo si tu as plus de questions

Thibault

124.    While the proposal for Longview to invest in INVH was under consideration, on April 14, 2020, Adrien sent another email to the Longview board, explaining that they were "monitoring" the "opportunity" and he "wanted to give [the board] an update." He explained that INVH was "an additional source of diversification for Lafayette Longview" and that "the current market dislocation"—in other words, the Covid-19 market crash—presented "a great opportunity to diversify our SFR investments by getting exposure to [INVH's] portfolio...."

125.    In that same email, Adrien added that he "just got off the phone with a principal at [The] Carlyle [Group], he was reporting to me that their conviction for the asset class has only increased in the last few days. They want us to take advantage of the current situation, and go and find more SFR communities from homebuilders. They ... have witnessed strong leasing activity in the last few weeks, and similar collection numbers."

126.    Upon information and belief, The Carlyle Group's principal referred to in the email is Scott Weir, Adrien's main point of contact for the joint venture of The Carlyle

Group and Lafayette, Lafayette Communities, which invests in newly built single-family home communities.

127. Joel Roberto, another Longview director, replied the next day, April 15, 2020, thanking Adrien for his analysis and explaining that he "hadn't expected to consider putting Longview's excess cash into publicly listed securities...."

128. Ultimately, Longview's board, including Villa, Ogrinz, Roberto, Ormond, and Guerrand-Hermes approved deploying some of Longview's capital into INVH, but the purchase did not materialize as the stock quickly recovered given the sector's underlying strength and first quarter 2020 positive results to the markets.

### 2. Positive Market Signals in the Single Family Real-Estate Rental Market

129. On a similar timeline, as early as April 13, 2020, competitors in the single-family residential real estate business including, for example, American Homes 4 Rent, were reporting historically strong occupancy and rent collection rates to the public markets. No unusual bulge in rent delinquency nor deferral requests materialized for these companies.

130. Lafayette was seeing similar signals and, as shown above, was reporting those signals to investors to take advantage of the market dislocation and invest even more capital in the single-family residential real estate sector.

131. These signals—which Adrien and others could see contemporaneously in real-time data—were later confirmed by Lafayette's financial reports. According to Lafayette's annual report, in the first quarter of 2020, the home portfolio performed strongly and was on an upward trend as measured by occupancy and renewals compared to the last quarter of 2019. Certainly, none of these datapoints signaled unusual solvency,

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

delinquency, or other issues that would have required the Entity Defendants to need the PPP loans.

132.   A table, which appears on page 44 of Lafayette's 2020 Annual Report and is reproduced below, illustrates that every quarter of 2020 had healthy occupancy, strong renewal rates, high rent collection, and above inflation rent increases across multiple geographies:

**Chart 31: SFR Key Performance Indicators**

| Rent Increase | Q1 20 | Q2 20 | Q3 20 | Q4 20 | FY 20 |
|---|---|---|---|---|---|
| Atlanta | 6.0% | 5.7% | 5.6% | 5.3% | 5.7% |
| Tampa | 6.1% | 5.1% | 4.1% | 7.0% | 5.5% |
| Jacksonville | 5.4% | 5.5% | 4.3% | 4.9% | 5.0% |
| Orlando | 6.3% | 4.8% | 3.9% | 4.7% | 5.1% |
| Ft Lauderdale | 0.0% | 5.0% | 0.6% | 4.5% | 3.0% |
| Memphis | 3.8% | 3.1% | 5.0% | 2.5% | 3.4% |
| Indianapolis | 3.8% | 3.0% | 2.4% | na | 3.0% |
| W. Avg | 5.9% | 5.2% | 4.8% | 5.5% | 5.4% |

| Collection | Q1 20 | Q2 20 | Q3 20 | Q4 20 | FY 20 |
|---|---|---|---|---|---|
| Atlanta | 94.7% | 94.1% | 95.4% | 95.0% | 94.8% |
| Tampa | 97.5% | 96.5% | 96.7% | 98.0% | 97.2% |
| Jacksonville | 94.8% | 92.5% | 95.8% | 96.0% | 94.8% |
| Orlando | 96.9% | 92.5% | 91.3% | 94.3% | 93.7% |
| Ft Lauderdale | 85.5% | 91.7% | 81.0% | 78.7% | 84.2% |
| Memphis | 79.8% | 85.7% | 113.5% | 102.9% | 94.9% |
| Indianapolis | 95.1% | 92.3% | 97.1% | 90.1% | 93.6% |
| W. Avg | 95.0% | 93.8% | 95.0% | 95.2% | 94.6% |

| Renewal Rate | Q1 20 | Q2 20 | Q3 20 | Q4 20 | FY 20 |
|---|---|---|---|---|---|
| Atlanta | 87.3% | 79.5% | 74.2% | 81.3% | 80.4% |
| Tampa | 81.3% | 74.4% | 82.8% | 86.0% | 80.4% |
| Jacksonville | 75.5% | 75.0% | 71.1% | 68.8% | 72.6% |
| Orlando | 52.9% | 51.0% | 50.0% | 50.0% | 51.3% |
| Ft Lauderdale | 20.0% | 20.0% | 60.0% | 58.3% | 44.4% |
| Memphis | 40.0% | 60.0% | 100.0% | 83.3% | 68.0% |
| Indianapolis | 75.0% | 73.3% | 50.0% | na | 68.0% |
| W. Avg | 76.1% | 71.5% | 72.6% | 75.8% | 74.0% |

| Occupancy | Q1 20 | Q2 20 | Q3 20 | Q4 20 | EOY 20 |
|---|---|---|---|---|---|
| Atlanta | 94.9% | 98.5% | 97.6% | 97.8% | 97.9% |
| Tampa | 96.9% | 97.8% | 98.8% | 98.1% | 98.2% |
| Jacksonville | 94.1% | 96.6% | 95.3% | 95.8% | 96.2% |
| Orlando | 94.7% | 95.9% | 94.1% | 94.3% | 95.3% |
| Ft Lauderdale | 95.7% | 91.5% | 83.0% | 75.4% | 77.8% |
| Memphis | 96.8% | 96.8% | 100.0% | 100.0% | 100.0% |
| Indianapolis | 90.9% | 90.9% | 93.9% | 97.0% | 97.0% |
| W. Avg | 95.2% | 97.2% | 96.5% | 96.2% | 96.6% |

133.   Adrien relayed to Relator and others that he and others at Lafayette and Brandywine were checking this real-time data on AppFolio, Brandywine's accounting and property management software platform, in the spring of 2020, and knew or should

have known—consistent with what was later shown by the annual report—that vacancies were not rising above usual levels.

134.    In addition, Adrien stayed in close communication with two executives who were also paying close attention to this data. Heidi Coppola (SVP of Operations at Lafayette) and Jackie Lee (CEO of Brandywine) both looked at this real time data on the portfolio's performance and, upon information and belief, communicated the updates to Adrien on a daily or near-daily basis.

135.    Another Lafayette executive, Maylis de Lacoste—the company's marketing director[5]—launched and maintained marketing campaigns to attract new tenants into Lafayette's properties under management, especially its new development communities, and tracked engagement and customer acquisition from those marketing strategies in real time.

### 3.    Defendants' Revenue Model Assured They Would Survive— and Thrive—during the Pandemic

136.    Lafayette, as an asset manager for its investment funds' properties, received management fees based on a fixed percentage of the value of the funds' assets under management.

137.    In addition to Lafayette's stable revenues as an asset manager, its ownership of an 11.5% stake in Longview resulted in additional revenues of approximately $460,000 over the course of 2020 through Longview's semi-annual distributions.

---

[5] Maylis de Lacoste was also the director of marketing and business development for Brandywine.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

138.   Brandywine, similarly, received a management fee based on a fixed percentage of the rent collected from Lafayette properties for which it provided services.

139.   In other words, if the underlying home portfolio's occupancy and rent collection were stable or rising, and the value of the underlying properties remained stable or went up, the Entity Defendants stood to make the same or more money throughout the COVID-19 crisis than they were making before.

140.   The chart below, which appears on page 25 of Lafayette's 2020 Annual Report, illustrates that every quarter of 2020 has higher occupancy and more lease renewals than the same quarter in 2019:



141.   In contradiction to all these positive indicators, summarized by Adrien's rosy analysis to his board in early and mid-April 2020 and his pledge to take advantage of "market dislocation" by aggressively investing in INVH and other ventures, on April 27, 2020, when emailing a representative at Wells Fargo about the status of Brandywine's loan application, Adrien asked for "support / follow up" because "[t]his entity needs the SBA support asap."

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

### 4.    Omission of Lafayette's Longview Distributions from PPP Application Supporting Materials

142.    Importantly, Longview's ability to make distributions (to Lafayette and others) is directly dependent on receiving rents from the underlying single-family homes. Accordingly, in addition to the real-time data indicating no economic concern or uncertainty, Adrien also knew that Longview was on track to distribute millions of dollars of dividends to its members including Lafayette. In other words, Lafayette was on track to receive hundreds of thousands of dollars in distributions from Longview a few months after applying for the PPP loan because there had been no unusual economic impact on rent collection.

143.    The income statement below was submitted to the SBA Lender as part of the PPP loan application:

| Lafayette RE Management LLC - Cash P&L as of 4/21/2020 | |
| --- | --- |
| | **YTD 2020** |
| **Total Revenues** | **823,839** |
| Payroll | (609,592) |
| Amex | (31,741) |
| Misc | (996) |
| Rent | (64,485) |
| Total expenses | (706,813) |
| **Pre-Tax Income** | **117,026** |

144.    An email dated April 21, 2020 confirms that Adrien prepared this income statement personally in response to a request from Ready Capital, the financial institution that processed Lafayette's PPP application.

145.    Neither this income statement nor any other document submitted in support of the PPP application disclosed to the lender or the SBA that Lafayette was about to receive Longview 2020 dividend distributions, which would essentially double

the revenue figure. That extra revenue would then be passed on proportionally through distributions to Adrien and the other members of Lafayette.

146.    This income statement also omitted Lafayette's distribution of approximately $475,525, equivalent to its 11.5% ownership of Longview, from Longview's 2019 investment profit distribution.

147.    Upon information and belief, Longview's 2019 Investment Profits distribution to investors, including Lafayette's 11.5% share, occurred in the first quarter of 2020. The February 6, 2020 presentation to Longview's board, *see supra* ¶¶ 34–35, stated on page 2 that Longview "intend[s] to distribute the full amount of Investment Profit [$4.135 million] as quickly as possible."

148.    This distribution was not disclosed to Ready Capital or the SBA.

**B.    The Individual Defendant directs Entity Defendants to use PPP proceeds for unlawful purposes.**

149.    As explained above, Adrien, in his domination of the Entity Defendants, did not think of, apply for, or use the PPP money to support employees of a business paused or otherwise struggling in the early days of the COVID-19 pandemic.

150.    Rather, Adrien, through the Entity Defendants, saw the opportunity to get free money from the government that would allow him to continue to enrich himself as an owner while also pursuing aggressive and expensive corporate acquisitions that, but for the PPP loans, would not have been possible without putting up more of his own money.

151.    In other words, the PPP money freed Adrien up to aggressively spend the Entity Defendants' cash on other pursuits without putting in any additional monies of his own.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

### 1.   Expenses Related to a Corporate Acquisition

152.   Starting in or about November 2019, Lafayette sought to acquire Patch of Land, a large national mortgage loan originator.

153.   At that time, Lafayette and Patch of Land executed a non-disclosure agreement.

154.   After due diligence led by Relator, on or about March 3, 2020, Lafayette submitted an initial offer to acquire Patch of Land. When the COVID-19 crisis escalated later in March 2020, Lafayette's process to acquire Path of Land was put on hold.

155.   But then, after being approved for and receiving the PPP loans, in or about June 2020, Lafayette re-engaged in its efforts to acquire Patch of Land. This timing is not a coincidence.

156.   Between June 2020 and May 2021—when Lafayette finally reached a deal with Prudential Global Investment Management ("PGIM"), a subsidiary of Prudential Financial, Inc., to partner in the Patch of Land acquisition—Lafayette incurred substantial third-party expenses related to legal fees, due diligence, and financing of the potential acquisition.

157.   Lafayette incurred more than $1.3 million in such expenses, approximately a third of Lafayette's average annual revenue. Lafayette advanced these expenses itself, because it had not yet reached a deal with PGIM or any other investing partner to defray that cost.

158.   In other words, as Adrien freely admitted to Relator in Slack messages, the PPP loan proceeds were free money he could use to invest in the Entity Defendants and grow these businesses. Further, the loan proceeds were an indispensable part of Adrien's ability to pursue the protracted, expensive, and ultimately unsuccessful acquisition of

Patch of Land without having to invest additional working capital himself as the managing (and majority) member.

159.    Thus, Lafayette's PPP loan proceeds were not economically necessary to support their ongoing operations when those representations were made in the PPP application and loan note.

160.    Instead, Lafayette's PPP loan helped it to fund an aggressive and failed corporate acquisition which would have resulted, if successful, in a multi-million-dollar windfall for Adrien and his partners. This was not a permissible use of a PPP loan.

## 2.    Personal Distributions from the Entity Defendants

161.    During the course of the pandemic, Adrien continued to take distributions and cash advances from the Entity Defendants, on at least a quarterly or more frequent basis.

162.    Because Lafayette was also pursuing the Patch of Land acquisition, incurring all the associated expenses of that potential acquisition upfront, and paying its employees and members, Adrien's distributions to himself and other owners of the Entity Defendants during 2020 would have been impossible without the PPP loans.

163.    As explained above, Lafayette, which has an 11.5% stake in Longview, received approximately $460,000 in semi-annual 2020 distributions from Longview's profits, which then would be substantially "passed through" to Lafayette's members, including Adrien.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

164.    The table below, which appears on page 45 of Lafayette's 2020 Annual Report, illustrates that Longview distributed $4 million over the course of the year to investors, including Lafayette and Adrien's own personal investment vehicle Mangrove US LLC:

**Chart 26: Longview Investment Recap**

| Investment Recap | Fund 1 | Fund 2 | GP | Total |
|---|---|---|---|---|
| Original Capital | 41,825 | 40,310 | | 82,135 |
| Excluding 2018 Sellers | (15,818) | (8,495) | | (24,313) |
| Adjusted Original Capital | 26,008 | 31,815 | | 57,823 |
| Distribution - 2014 | (16,634) | - | | (16,634) |
| Distribution - 2018 | - | (1,788) | | (1,788) |
| Net Invested Capital at Merger | 9,374 | 30,028 | - | 39,402 |
| Net Step up at Merger | 22,756 | 17,452 | 10,383 | 50,592 |
| Merger Book Value | 32,130 | 47,480 | 10,383 | 89,994 |
| Merger Multiple over Net Cost Basis | 3.4x | 1.6x | | |
| Cash on Cash Multiple since inception | 1.9x | 1.5x | | |
| Gross IRRs | 18.2% | 15.4% | | |
| Since Merger into Longview | | | | |
| Cash Distribution - August 2019 | (1,535) | (2,269) | (496) | (4,300) |
| Cash Distribution - July 2020 | (714) | (1,055) | (231) | (2,000) |
| Cash Distribution - December 2020 | (714) | (1,055) | (231) | (2,000) |
| 12/31/2020 NAV | 34,442 | 50,896 | 11,131 | 96,469 |
| Cash Return - Since Merger | 9.2% | 9.2% | 9.2% | 9.2% |
| Capital Appreciation Return - Since Merger | 7.2% | 7.2% | 7.2% | 7.2% |
| Total Returns - Since Merger | 16.4% | 16.4% | 16.4% | 16.4% |
| Total Returns - Since Inception | 108% | 79% | | |

165.    On information and belief, as explained above, Longview issued the first distribution in the first quarter of 2020, and Lafayette's share would in turn be passed through to its investors, including Adrien.

166.    However, on information and belief, Lafayette would not have received its second semiannual Longview distribution until much later in 2020, long after Lafayette had received its PPP loan.

167.    On information and belief, because Lafayette's cash balances were commingled in a single operating bank account, during the second and/or third quarters of 2020, Lafayette would have needed to use funds from the PPP loans to cover deal

expenses and/or Adrien's personal distributions, even if it later received additional capital.

168.    This flexible misuse of the PPP funds was not an appropriate use of the loan funds consistent with the law or Lafayette and Adrien's certifications in the loan application and note.

### 3.    Funding Key Hires and Infrastructure Projects

169.    According to Lafayette's 2020 annual report, over the course of the year, "Brandywine opened four new offices, improved operating metrics, attained 35% YoY growth in number of properties under management and rolled out a new employee compliance and training program."

170.    As mentioned above, Lafayette and Brandywine's director of marketing, Maylis de Lacoste, significantly increased the marketing budget of both companies to attract more customers, especially to Lafayette's new development "build for rent" communities, and rolled out a client relationship management (CRM) platform to monitor engagement and customer acquisition from those marketing efforts.

171.    Lafayette's 2020 annual report also explained that Brandywine "rolled out a more robust employee compliance and training program" and made other "upgrades in both systems and people...."

172.    Large-scale investment, such as opening four new offices, one of which is located in San Antonio, would not have been possible but for the PPP funds Brandywine received from the federal government.

173.    In or about 2021, Lafayette also hired three new senior executives:

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

174.    As described in Lafayette's 2020 Annual Report, Brad Stanis "has over 12 years of experience in land acquisitions and development, with 8+ years at Lennar, one of the nation's most prominent homebuilders."

175.    As described in Lafayette's 2020 Annual Report, Josh Nathan "spent 11 years at Cerberus Capital Management, with the last 4 at FirstKey Homes (Cerberus' portfolio company) as a Senior Vice President, overseeing real estate acquisitions and asset management."

176.    As described on his LinkedIn profile, Cyrus Shahabi spent the last eight years working at prestigious organizations such as McKinsey & Co and Gramercy Fund Management. He is a graduate of Yale University and of the Wharton School at The University of Pennsylvania.[6]

177.    These new Lafayette executives received significant six-figure salaries.

178.    Because the business was as strong as ever, Lafayette and Brandywine's PPP loan proceeds were not economically necessary to support their ongoing operations when those representations were made in the PPP application and loan note.

179.    Instead, the PPP loan proceeds allowed Defendants to invest in the expansion of their business through hiring new executives and investing in new infrastructure, neither of which are permissible purposes for PPP loans.

**C.    Adrien lists fake employees in support of the PPP application.**

180.    In addition to the misrepresentation of economic necessity for the Entity Defendants' PPP loans, Defendants listed at least two fake employees of Lafayette, each

---

[6] https://www.linkedin.com/in/cyrusshahabi/

with personal connections to Adrien, in supporting payroll documentation prepared for Lafayette's PPP application.

### 1.   Thomas Coleman

181.   Thomas E. Coleman is a friend and former colleague of Adrien's from a prior business before Adrien founded Lafayette.

182.   Coleman is a minority investor in Lafayette.

183.   In or about 2019, Adrien held discussions with Coleman and another financial executive, T.D., to launch a commercial real estate lending joint venture and join Lafayette as employees. In or about late February or early March 2020, that plan was abandoned. Relator understood at the time that Coleman was not hired by Lafayette.

184.   On or about November 23, 2020, Lafayette submitted its PPP loan forgiveness application on SBA Form 3508.

185.   Relator, using the payroll materials provided to him and at Adrien's direction, filled out a Microsoft Excel template spreadsheet provided by the lender that would calculate the necessary payroll information for "PPP Schedule A," an attachment to the loan forgiveness application requiring the borrower to disclose the payroll costs for which it sought forgiveness from the SBA.

186.   Among the payroll used to calculate that forgiveness amount, Relator was directed to include certain of Lafayette's payroll costs from May 2020, including $3,289.39 in "Forgiveness Eligible Payroll Cost" for Coleman, including wages, benefits, taxes, and other costs.

187.   Lafayette disclosed its "Cash Compensation" on Line 1 of Schedule A to be $143,725.78, including the amount from May 2020 for Coleman.

188.    Lafayette disclosed its Cash Compensation on Line 4 of Schedule A to be $183,193.70, which included the amount from May 2020 for Coleman.

189.    Adrien had "hired" Coleman at Lafayette with an annual salary of $23,400.

190.    Coleman was listed as an employee in a payroll report dated April 6, 2020, which was generated to support Lafayette's application for its PPP loan.

191.    However, Coleman was not a real employee of Lafayette. Coleman did no work for Lafayette. He did not execute a standard non-disclosure agreement like all other Lafayette employees, did not use a Lafayette email address, and had no access to Lafayette's Dropbox account or any of its internal files.

192.    Nevertheless, Coleman was listed as an employee whose salary supported Lafayette's PPP loan application.

193.    Relator, noticing that Coleman was a listed employee whom he had never seen in the office, observed working on behalf of Lafayette, or interacted with in any way in such a capacity, later asked Adrien about Coleman and whether he had indeed been hired. This occurred within a few weeks after Relator submitted the loan forgiveness application as he was instructed to do by Adrien.

194.    Adrien explained to Relator that he added Coleman to the Lafayette payroll as a favor so that Coleman could receive benefits from Lafayette while he was unemployed.

195.    In the same conversation, Adrien also said that Coleman "reimbursed" him for the money Lafayette incurred paying for his salary and benefits.

196.    Despite listing Coleman as a Lafayette employee in support of the PPP application and forgiveness, neither Lafayette nor Adrien disclosed these material facts to the SBA.

### 2.    Adrien Requests PPP Money to Pay his Housekeeper as an Employee of Lafayette

197.    In or about 2019, Adrien "hired" his housekeeper, identified here by the initials "M.M.," as an "employee" of Lafayette.

198.    M.M. appeared on the same April 6, 2020 payroll report generated in support of Lafayette's PPP application with an annual salary of $27,040.

199.    Most of the time, M.M. could not and did not work for Lafayette, because she was working in Adrien's home as a housekeeper and nanny.

200.    In or about the summer of 2019, when Adrien's wife and children were out of the country and/or on vacation, M.M. came to Lafayette's office from approximately 9am – 1pm every weekday.

201.    When M.M. came to the office part-time during the summer of 2019, she sat at a desk near Relator. For significant portions of the day, she would sit at her desk, doing nothing. Occasionally, M.M. would pick up a photocopy from a printer and deliver it to Adrien at his desk, or order lunch. None of these activities justified her salary.

202.    M.M. did not execute a standard Lafayette NDA despite being exposed to investors' personal information and Lafayette's proprietary information.

203.    Upon information and belief, Adrien's primary motivation for hiring M.M. while his family was away on vacation was to reduce his out-of-pocket personal expenses and have Lafayette cover her compensation.

204.    Despite listing M.M. as a Lafayette employee in support of the PPP application, neither Lafayette nor Adrien disclosed these material facts to the SBA.

### D.    Adrien includes foreign nationals, working in the United States based on Adrien's manipulation and abuse of the immigration system, on PPP Application Payroll.

205.    Adrien's employment practices include hiring recent graduates from elite European business schools to work full time for Lafayette under short-term work visas and F-1 student visas intended for students in American universities.

206.    All of Lafayette's employment procedures are managed exclusively by Adrien and Levilain. No other employees interact with payroll providers or immigration advisors, except when applicable to an employee's personal case.

207.    Adrien and his partners promise these students the American Dream, but instead pay them substandard wages and trap them in their employment at Lafayette by enrolling them in a little-known university's online graduate program, on which they are dependent for their visas and ability to remain and work in the U.S.

208.    Adrien primarily targets his recruitment efforts at HEC Paris, in France, and specifically on non-French graduates from emerging markets, as Adrien perceives such nationals, including those of Pakistani, Indian, Brazilian, and Moroccan national origins, to be more dependent on Lafayette's ability to provide a visa to enter and work in the U.S., and thus more willing to accept lower salaries and inferior treatment than a U.S. national.

209.    The payroll file submitted to the SBA for Lafayette's PPP Loan application includes a number of foreign nationals on such short-term work and F-1 student visas, including an employee identified here by the initials "R.A."

210.   R.A. originally came to the U.S. on a short-term work visa obtained by Lafayette. After R.A. failed to obtain an H-1B work permit, Adrien then obtained a F-1 student visa for him by enrolling him in a graduate program at Harrisburg University (Pennsylvania), with the sole objective of keeping him in the U.S. while working for Lafayette.

211.   Lafayette would cover the tuition costs and associated expenses of these employees' enrollment and attendance at Harrisburg University in a Project Management Master's program, meanwhile paying the employees at below-market rates.

212.   Graduates from leading European business schools such as HEC Paris and ESSEC would have no need or economic incentive to pursue another master's degree at Harrisburg University but for the F-1 visa.

213.   In fact, Lafayette employees that have been enrolled in this program like R.A do not even list their Harrisburg University education in their LinkedIn profiles or Lafayette website bios.

214.   Because the graduate program was unnecessary and unrelated to the "students'" work at Lafayette, the program did not satisfy relevant United States Citizenship and Immigration Services ("USCIS") and/or Immigration and Customs Enforcement ("ICE") guidelines for Curricular Practical Training ("CPT") under F-1 visas.

215.   R.A. (and others employed by Lafayette but not listed in the payroll files submitted in support of the PPP application) were enrolled in "work study" graduate programs to justify their F-1 visas, and ability to remain legally in the U.S., pressuring them to continue working for Lafayette under CPT for non-market salaries.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

216.    For example, R.A. who is listed in Lafayette's website as an employee who "supports the fund controller with financial reporting and management," graduated from HEC Paris in 2019 and came to the U.S. to work at Lafayette on a short-term work visa. His role and responsibilities are inconsistent with guidelines issued by ICE on CPT.

217.    Guidance issued by ICE on CPT[7] states that CPT "[m]ust relate directly to the student's major area of study and be an integral part of the school's established curriculum." However, Harrisburg University's Masters in Project Management[8] ("the Harrisburg Program") "leads to a Master of Science degree that prepares the student for career advancement in the field of project management and for positions such as program manager, project manager, project coordinator, lead project engineer, Agile project manager, or ScrumMaster."

218.    In fact, the "Program Concentrations" of the Harrisburg Program, stated on its website as, "Agile Lean, Biotechnology, Human-Centered Interaction Design, Individualized,"[9] are unrelated to any function an employee could possibly perform within a real-estate asset manager such as Lafayette, and are clearly disconnected from R.A.'s role at Lafayette.

---

[7] https://www.ice.gov/sites/default/files/documents/Fact%20sheet/2019/CurricularPracticalTraining.pdf

[8] https://www.harrisburgu.edu/programs/ms-project-management/

[9] *Id.*

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

219.   R.A., as well as many other foreign nationals that have been brought to work at Lafayette under this short-term work visa scheme *modus operandi*, were students of Ogrinz's at HEC Paris, where he serves in the faculty.

220.   Having secured at least one employee who was, in sum and substance, illegitimate with a fraudulent visa, Adrien and Lafayette then applied for a PPP loan to "protect" his paycheck.

221.   Despite listing R.A. as a Lafayette employee in support of the PPP application, neither Lafayette nor Adrien disclosed these material facts to the SBA.

## CAUSES OF ACTION

### COUNT I – Violation of 31 U.S.C. § 3729(a)(1)(A)
### (Presentation of False Claims for Payment)
### (Against All Defendants)

222.   Relator repeats and re-alleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

223.   This a claim for treble damages and penalties under the FCA.

224.   The FCA, 31 U.S.C. § 3729(a)(1)(A), imposes liability upon those who knowingly present or cause to be presented false claims for payment or approval.

225.   Through the acts described above and otherwise, Defendants knowingly presented, or caused to be presented, materially false or fraudulent claims for payment or approval to the United States by applying for and receiving PPP loans guaranteed by the SBA, which loans Defendants certified (expressly in their loan applications, loan notes, and implicitly by accepting and retaining the loan proceeds) were necessary to support ongoing operations due to current economic uncertainty, despite the fact that they knew or should have known that the loan proceeds were not necessary to support

ongoing operations due to current economic uncertainty, in violation of 31 U.S.C. § 3729(a)(1)(A).

226.    In addition, Defendants knowingly presented, or caused to be presented, materially false or fraudulent claims for payment or approval to the United States by applying for and receiving PPP loans guaranteed by the SBA, which loans Defendants certified (expressly in their loan applications, loan notes, and implicitly by accepting and retaining the loan proceeds) would be used for authorized purposes despite the fact that they knew or should have known that the loan proceeds would not be used, and in fact were not used, for those authorized purposes in violation of 31 U.S.C. § 3729(a)(1)(A).

227.    These false claims were later remade and/or reaffirmed when Defendants certified in their PPP loan notes that "All certifications, authorizations, and representations made by Borrower and/or the authorized representative of Borrower in the Paycheck Protection Program Borrower Application Form (SBA Form 2483) submitted to Lender remain true and accurate as of the date of this Note."

228.    Subsequent false claims were then made in Lafayette's application for loan forgiveness, signed by Adrien, due to, *inter alia*, his certification on behalf of Lafayette that the money for which Lafayette sought loan forgiveness "was used to pay costs that are eligible for forgiveness," when in fact Lafayette and Adrien knew or should have known that they sought loan forgiveness for ineligible expenses, including wages, benefits, and other costs.

229.    Each of the false or fraudulent claims submitted, or caused to be submitted, by Defendants is a separate violation of 31 U.S.C. § 3729(a)(1)(A).

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

230.   The United States was unaware of the false or fraudulent nature of the claims Defendants submitted or caused to be submitted.

231.   The false or fraudulent claims Defendants knowingly submitted or caused to be submitted to the United States were material to the United States' decisions to approve and guarantee the loans.

232.   Had the United States actually known of the false or fraudulent nature of the claims, it would have been prohibited by law from making corresponding payments.

233.   Because of these false or fraudulent claims Defendants submitted or caused to be submitted, the United States has been damaged in an amount to be determined at trial.

## COUNT II – Violation of 31 U.S.C. § 3729(a)(1)(B)
### (Use of False Statements Material to False Claims)
### (Against All Defendants)

234.   Relator repeats and re-alleges the preceding paragraphs as if fully set forth herein.

235.   This is a claim for treble damages and penalties under the FCA.

236.   The FCA, 31 U.S.C. § 3729(a)(1)(B), imposes liability upon those who knowingly make, use, or cause to be made or used false records or statements material to a false or fraudulent claim.

237.   Through the acts described above and otherwise, Defendants knowingly made, used, or caused to be made or used false records or statements material to the payment of false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

238.    For purposes of obtaining or aiding to obtain payment or approval of PPP loans guaranteed by the SBA, Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements.

239.    Specifically, Defendants made or used, or caused to be made or used, false certifications by certifying (expressly in their loan applications, loan notes, and implicitly by accepting and retaining the loan proceeds) that the loans were necessary to support ongoing operations due to current economic uncertainty, despite the fact that they knew or should have known that the loan proceeds were not necessary to support ongoing operations due to current economic uncertainty, in violation of 31 U.S.C. § 3729(a)(1)(B).

240.    In addition, Defendants made or used, or caused to be made or used, false certifications by certifying (expressly in their loan applications, loan notes, and implicitly by accepting and retaining the loan proceeds) that the loan proceeds would be used for authorized purposes despite the fact that they knew or should have known that the loan proceeds would not be used, and in fact were not used, for those authorized purposes in violation of 31 U.S.C. § 3729(a)(1)(B).

241.    These false certifications were later remade and/or reaffirmed when Defendants certified in their PPP loan notes that "All certifications, authorizations, and representations made by Borrower and/or the authorized representative of Borrower in the Paycheck Protection Program Borrower Application Form (SBA Form 2483) submitted to Lender remain true and accurate as of the date of this Note."

242.    In addition, Lafayette and Adrien made or used, or caused to be made or used, false certifications by, in seeking loan forgiveness, certifying that the loan amount

for which forgiveness was requested was used, *inter alia*, to pay costs eligible for forgiveness.

243.   Defendants' false certifications and representations were made for the purpose of ensuring that the United States guaranteed the loans and paid the false or fraudulent claims in connection with the loans, which was a reasonable and foreseeable consequence of Defendants' statements and actions.

244.   Each false record, certification, and/or application submitted to the PPP lender and/or the government in support of Defendants' applications for PPP loan issuance and/or forgiveness, and which resulted in the above-described false or fraudulent claims submitted to the government, is a separate false record or statement and a separate violation of 31 U.S.C. § 3729(a)(1)(B).

245.   The United States was unaware of the falsity of the records, statements, and claims Defendants made or submitted and, because of the inaccuracy of these records or statements, authorized payments to be made, made such payments, and has been damaged.

246.   The false records or statements were knowingly made by Defendants in connection with their applications for PPP loan issuance and/or forgiveness and were material to the United States' decisions to guarantee the loans and to make payments in connection with those loans.

247.   Had the United States actually known of the false nature of Defendants' representations, it would have been prohibited by law from making corresponding payments.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

248.    Because of these false records or statements, the United States paid claims, resulting in damages to the United States in an amount to be determined at trial.

## COUNT III – Violation of 31 U.S.C. § 3729(a)(1)(C)
### (Conspiracy)
### (Against All Defendants)

249.    Relator repeats and re-alleges the preceding paragraphs as if fully set forth herein.

250.    This is a claim for treble damages and penalties under the FCA.

251.    The FCA, 31 U.S.C. § 3729(a)(1)(C), imposes liability upon those who conspire to commit a violation of another sub-section of the FCA.

252.    Defendants knowingly, in reckless disregard, and/or in deliberate ignorance of the truth conspired between themselves, with their employees and administrators, and others, to violate the FCA in the manner set forth in Counts I and II above.

253.    In particular, Defendants conspired to submit, or caused to be submitted, materially false or fraudulent claims for payment or approval to the United States by applying for and receiving PPP loans guaranteed by the SBA, which loans Defendants certified (expressly in their loan applications, loan notes, and implicitly by accepting and retaining the loan proceeds) were necessary to support ongoing operations due to current economic uncertainty, despite the fact that they knew or should have known that the loan proceeds were not necessary to support ongoing operations due to current economic uncertainty.

254.    In addition, Defendants conspired to submit, or caused to be submitted, false or fraudulent claims related to applying for and receiving PPP loans guaranteed by

- 49 -

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

the SBA, which loans Defendants certified (expressly in their loan applications, loan notes, and implicitly by accepting and retaining the loan proceeds) would be used for authorized purposes despite the fact that they knew or should have known the loan proceeds would not be so used, and in fact were not used for those authorized purposes.

255. Defendants also conspired to knowingly make, use, or cause to be made or used, false records or statements in applying for and receiving PPP loans guaranteed by the SBA, which false records or statements were material to false or fraudulent claims for payment submitted to the government concerning those loans.

256. Had the United States actually known of the false or fraudulent nature of Defendants' representations and claims, it would have been prohibited by law from making corresponding payments.

257. Because of these conspiracies, and the resulting false or fraudulent claims Defendants submitted or caused to be submitted, the United States paid the claims, resulting in damages to the United States in an amount to be determined at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff-Relator demands and prays that judgment be entered against Defendants, jointly and severally, as to the claims as follows:

i.      ordering that Defendants cease and desist from violating the FCA;

ii.     directing that each Defendant pay an amount equal to three times the amount of damages the United States has sustained because of such Defendant's actions;

- 50 -

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT

iii.    directing that each Defendant, pursuant to the FCA, pay penalties of not less than $12,537 and not more than $25,076 for each Defendant's violation of the FCA;

iv.    granting Plaintiff-Relator the maximum amount allowed under 31 U.S.C. § 3729 and/or any other applicable provision of law;

v.    directing that each Defendant, jointly and severally, pay Plaintiff-Relator's fees and costs, including attorneys' fees, as provided by the FCA;

vi.    directing that each Defendant pay interest on all sums ordered paid;

vii.    ordering that Plaintiff-Relator recover such other relief as the Court deems just and proper; and

viii.    granting such other and further relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby requests a trial by jury.

Dated: June 22, 2022        POLLOCK COHEN LLP

                          */s/ Max E. Rodriguez*
                      Max Rodriguez (N.Y. Attorney # 5422811)
                      Adam Pollock* (N.Y. Attorney # 4518833)
                      60 Broad Street, 24th Floor
                      New York, NY 10004
                      (212) 337-5361
                      max@pollockcohen.com
                      adam@pollockcohen.com

                      *Attorneys for Plaintiff/Relator*

                      *to be admitted *pro hac vice*